**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION**

| | |
|---|---|
| KAREN LESLIE VAN DYKE,            ) | No. ED CV 14-1182-PLA |
| )                                    | |
| Plaintiff,     ) | |
| )                                    | |
| v.             ) | **MEMORANDUM OPINION AND ORDER** |
| )                                    | |
| CAROLYN W. COLVIN, ACTING    ) | |
| COMMISSIONER OF SOCIAL       ) | |
| SECURITY ADMINISTRATION,     ) | |
| )                                    | |
| Defendant.    ) | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on June 10, 2014, seeking review of the Commissioner's denial of her applications for Disability Insurance Benefits ("DIB"), and widow's insurance benefits. The parties filed Consents to proceed before the undersigned Magistrate Judge on July 22, 2014, and August 21, 2014. Pursuant to the Court's Order, the parties filed a Joint Stipulation on March 5, 2015, that addresses their positions concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## BACKGROUND

Plaintiff was born on July 6, 1960.  [Administrative Record ("AR") at 150.]  She has past relevant work experience as a floral designer.  [AR at 24, 61.]

On September 17, 2010, plaintiff filed an application for a period of disability and DIB, and an application for disabled widow's insurance benefits,[1] alleging that she has been unable to work since April 11, 2010.  [AR at 12, 150.]  After her applications were denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ").  [AR at 12, 89-92.]  A hearing was held on September 12, 2012, at which time plaintiff appeared represented by an attorney, and testified on her own behalf.  [AR at 32-67.]  A vocational expert ("VE") also testified.  [AR at 61-67.]  On September 28, 2012, the ALJ issued a decision concluding that plaintiff was not under a disability from April 11, 2010, the alleged onset date, through September 28, 2012, the date of the decision.  [AR at 12-25.]  Plaintiff requested review of the ALJ's decision by the Appeals Council.  [AR at 8.]  When the Appeals Council denied plaintiff's request for review on April 17, 2014 [AR at 1-6], the ALJ's decision became the final decision of the Commissioner.  See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted).  This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's

---

[1]    To be eligible for disabled widow's insurance benefits, the claimant must be the widow of the deceased worker, have attained the age of 50, be unmarried, and have a disability that began before the end of the prescribed period.  [AR at 12 (citing 20 C.F.R. § 404.335).]  The prescribed period ends with the month before the month in which the claimant attains age 60, or, if earlier, either 7 years after the worker's death or 7 years after the widow was last entitled to survivor's benefits, whichever is later.  [AR at 12-13 (citing 20 C.F.R. § 404.335).]  The ALJ found that plaintiff's prescribed period began on April 11, 2010, the date the wage earner died, and that plaintiff, therefore, must establish that her disability began on or before April 30, 2017, in order to be entitled to disabled widow's benefits.  [AR at 13.]

decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (citation and internal quotation marks omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (same).  When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (citation omitted); see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (citation and internal quotation marks omitted).  "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Ryan, 528 F.3d at 1198 (citation and internal quotation marks omitted); see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.") (citation omitted).

**IV.**

**THE EVALUATION OF DISABILITY**

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

/

## A.     THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995), as amended April 9, 1996.  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied.  Id.  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie case of disability is established.  Id.  The Commissioner then bears the burden of establishing that the claimant is not disabled, because she can perform other substantial gainful work available in the national economy.  Id.  The determination of this issue comprises the fifth and final step in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

/

/

/

/

## B.   THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since April 11, 2010, the alleged onset date.[2]  [AR at 15.]  At step two, the ALJ concluded that plaintiff has the severe impairments of "anxiety, depression, posttraumatic stress disorder (PTSD) and history of a collapsed lung."  [Id.]  At step three, the ALJ determined that plaintiff does not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listings.  [Id.]   The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[3] to perform light work as defined in 20 C.F.R. § 404.1567(b),[4] as follows:

> [C]an lift and/or carry twenty pounds occasionally, ten pounds frequently; [s]he can sit, stand or walk for six hours out of an eight-hour workday with customary breaks; [she] can occasionally, kneel, stoop, crawl, crouch and climb using ramps and stairs; [she] cannot climb using ladders, ropes or scaffolds; [she] has no restriction with regard to use of the hands for fine and gross manipulation; [she] must avoid concentrated exposure to extremely cold or humid weather; [she] can sustain concentration, attention, persistence and pace in at least two hour blocks of time[;] [she] can perform both complex and detailed tasks; due to symptoms of depression and anxiety, [she] requires a work environment that does not involve fast paced production requirements of assembly line work; [she] can respond appropriately to coworkers and supervisors, but would need casual, non-intense interaction with the

---

[2]    The ALJ concluded that plaintiff met the insured status requirements of the Social Security Act through March 31, 2009.  [AR at 14.]  She also noted that it was previously found that plaintiff is the unmarried widow of the deceased insured worker, has attained the age of 50, and meets the non-disability requirements for disabled widow's benefits.  [Id.]  She also found that the prescribed period ends on April 30, 2017.  [Id.; see also supra note 1.]

[3]    RFC is what a claimant can still do despite existing exertional and nonexertional limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

[4]    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

1 | general public; [she] would be off task up to five percent of the workday due to
2 | psychological distractions.

3 | [AR at 16-17.]   At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ

4 | concluded that plaintiff is able to perform her past relevant work as a floral designer.  [AR at 24,

5 | 62-64.]   Accordingly, the ALJ determined that plaintiff was not disabled at any time from the

6 | alleged onset date of April 11, 2010, through September 28, 2012, the date of the decision.  [AR

7 | at 32.]

8 |

9 | **V.**

10 | **THE ALJ'S DECISION**

11 | Plaintiff contends that the ALJ erred when she (1) gave less weight to plaintiff's treating

12 | physician, Daniel Fitzgerald, III, M.D.; and (2) relied on the opinion of examining psychiatrist

13 | Romualdo Rodriguez, M.D.  [Joint Stipulation ("JS") at 5-10.]

14 | As set forth below, the Court agrees with plaintiff and remands for further proceedings.

15 |

16 | **A.   LEGAL STANDARD**

17 | "There are three types of medical opinions in social security cases:  those from treating

18 | physicians, examining physicians, and non-examining physicians."  Valentine v. Comm'r Soc. Sec.

19 | Admin., 574 F.3d 685, 692 (9th Cir. 2009); see also 20 C.F.R. §§ 404.1502, 404.1527.  "As a

20 | general rule, more weight should be given to the opinion of a treating source than to the opinion

21 | of doctors who do not treat the claimant."  Lester, 81 F.3d at 830; Garrison v. Colvin, 759 F.3d

22 | 995, 1012 (9th Cir. 2014) (citing Ryan, 528 F.3d at 1198); Turner v. Comm'r of Soc. Sec., 613

23 | F.3d 1217, 1222 (9th Cir. 2010).  "The opinion of an examining physician is, in turn, entitled to

24 | greater weight than the opinion of a nonexamining physician."  Lester, 81 F.3d at 830; Ryan, 528

25 | F.3d at 1198.

26 | "[T]he ALJ may only reject a treating or examining physician's uncontradicted medical

27 | opinion based on clear and convincing reasons."  Carmickle, 533 F.3d at 1164 (citation and

28 |

internal quotation marks omitted); Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006). "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Carmickle, 533 F.3d at 1164 (citation and internal quotation marks omitted); Ryan, 528 F.3d at 1198; Ghanim v. Colvin, 763 F.3d 1154, 1160-61 (9th Cir. 2014); Garrison, 759 F.3d at 1012. The ALJ can meet the requisite specific and legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Reddick, 157 F.3d at 725. The ALJ "must set forth his own interpretations and explain why they, rather than the [treating or examining] doctors', are correct." Id.

**B.      THE MENTAL HEALTH OPINIONS AND THE WEIGHT GIVEN TO THEM BY THE ALJ**

       **1.      Treating Psychiatrist**

Dr. Fitzgerald, plaintiff's treating psychiatrist, treated plaintiff between March 7, 2011, and January 8, 2013. [See, e.g., AR at 346-61, 411-30.] On April 18, 2012, Dr. Fitzgerald completed a "Medical Source Assessment (Mental)." [AR at 346-48.] Dr. Fitzgerald opined that plaintiff would not be able to perform the following designated tasks or functions on a regular, reliable and sustained schedule: remember locations and work-like procedures; understand, remember, and carry out very short, simple instructions; understand, remember, and carry out detailed instructions; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; sustain ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday or workweek without interruption from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make

plans independently of others.  [Id.]  He also opined that plaintiff is able to perform the following

tasks or functions, but with noticeable difficulty more than 20 percent of the workday or workweek:

maintain attention and concentration for extended periods of time; interact appropriately with the

general public; ask simple questions or request assistance; and maintain socially appropriate

behavior and adhere to basic standards of neatness and cleanliness.  [AR at 346-47.]  Dr.

Fitzgerald diagnosed plaintiff with PTSD, and "M.D.D. [major depressive disorder], single, varies

from moderate to severe."  [AR at 348.]

　　　The ALJ gave "little weight" to Dr. Fitzgerald's opinion:

> The severity of the limitations he assessed are inconsistent with the claimant's
> record as a whole, which reveals the successful use of coping techniques including
> meditation and calming techniques.  His opinion is also inconsistent with the
> claimant's activities of daily living, including caring for multiple animals, some
> household chores and preparing simple meals.

[AR at 24.]

### 2.　　Licensed Clinical Social Worker

　　　On April 16, 2012, licensed clinical social worker ("LCSW") Joan Moyer, who treated plaintiff

between January and December 2012, completed a "Medical Source Assessment (Mental)."[5]  [AR

at 336-38.]  Ms. Moyer opined that plaintiff was unable to remember locations and work-like

procedures, understand, remember, and carry out detailed instructions, maintain attention and

concentration for extended periods, work in coordination with or proximity to others, and complete

a normal workday or workweek without interruptions from psychologically-based symptoms.  [AR

at 336-37.]  She found plaintiff was able to perform the following designated tasks but would have

difficulty with them more than 20 percent of the workday or workweek:  perform activities within

a schedule, and make simple work-related decisions.  [AR at 337.]  For the following tasks, plaintiff

would have difficulty between 11 and 20 percent of the workday or workweek:  understand,

remember, and carry out very short, simple instructions; maintain regular attendance; interact

---

[5]　　Because Ms. Moyer's findings and opinions provide record support for Dr. Fitzgerald's opinion, the Court discusses herein the ALJ's determination that Ms. Moyer's opinion is entitled to "little weight."

appropriately with the general public; and respond appropriately to changes in the work setting. [AR at 336-37.] Ms. Moyer concluded that based on her clinical observations and the results of screening tools, plaintiff exhibited "high levels of anxiety" during sessions; repetitive, catastrophic fears; and constant hypervigilence.  [AR at 338.]  Ms. Moyer also observed plaintiff's "extreme" weight loss.  [Id.]

The ALJ gave little weight to the opinion of Ms. Moyer, stating it is brief, conclusory, and inadequately supported by clinical findings. [AR at 23.] She also discounted that opinion because an LCSW is not considered an "acceptable medical source," and the opinion, therefore, "is not entitled to be given the same weight as a qualifying medical source opinion." [AR at 23-24.] The ALJ also noted that Ms. Moyer's opinion is "inconsistent with the objective medical evidence as a whole . . . that shows improved mental status examination," and with plaintiff's "admitted activities of daily living, including caring for multiple animals, performing personal grooming activities without assistance, some household chores, and occasionally using the internet." [AR at 24.]

### 3.    Consultative Examiner

The ALJ gave great weight to the opinion of the consultative examiner, Dr. Rodriguez, who conducted a complete psychiatric evaluation of plaintiff on January 28, 2011. [AR at 250-56.] Dr. Rodriguez noted that he had "no psychiatric records available for review" and that plaintiff was his source of information for the evaluation.  [AR at 250.]  He conducted a mental status examination and found that plaintiff made good eye contact; was generally cooperative; volunteered information spontaneously;  appeared genuine and truthful and with no evidence of exaggeration or manipulation; constantly moved her arms and legs during the interview; had a "very anxious" mood; her affect was "somewhat sad and she was tearful during the interview"; she was alert and oriented; she could recall three items immediately and one out of three after five minutes; she could perform serial threes; she could quickly complete simple math problems; she could spell "world" forwards and backwards; and she had reasonable insight into her problems.  [AR at 252-

9

54.]  Dr. Rodriguez diagnosed plaintiff with PTSD and attention deficit hyperactivity disorder

("ADHD").  [AR at 254.]  Dr. Rodriguez opined that functionally plaintiff is "able to understand,

remember, and carry out <u>simple</u> one or two-step job instructions"; able to do "detailed and <u>complex</u>

instructions"; minimally limited in her ability to:  relate and interact with supervisors, coworkers, and

the general public, adapt to stresses common to the work environment, maintain regular

attendance in the work place and perform work activities on a consistent basis, and perform work

activities without special or additional supervision; and slightly limited in her ability to maintain

concentration and attention, persistence and pace.  [AR at 255.]  He concluded that as long as

plaintiff "is properly treated for her PTSD and ADHD, she could easily recover from her symptoms

in the next twelve months."  [<u>Id.</u>]

The ALJ gave "great weight" to Dr. Rodriguez' opinion:

> Dr. Rodriguez personally observed and examined the claimant.  The undersigned
> has also generously considered the claimant's subjective complaints of memory
> problems, lack of concentration, depressive symptoms and anxiety.  The
> undersigned has further limited the claimant to no fast paced or assembly line type
> work, only non-intense interaction with the public and allows the claimant to be off
> task up to five percent of the workday due to psychological distractions.

[AR at 23.]  The ALJ assigned little weight to the opinions of the State agency mental medical

consultants because they determined plaintiff did not have a severe mental impairment and did

not "adequately consider" plaintiff's subjective complaints, and because Dr. Rodriguez' opinion "is

more consistent with the record as a whole."  [<u>Id.</u>]  The ALJ also stated that she "generously

consider[ed]" plaintiff's subjective complaints in determining the RFC.  [<u>Id.</u>]

## C.     ANALYSIS

### 1.     Consistency of Dr. Fitzgerald's Opinion with the Record as a Whole

The ALJ found the opinions of Dr. Fitzgerald and Ms. Moyer to be inconsistent with the

record as a whole.  [AR at 23-24.]  However, a review of the ALJ's discussion of plaintiff's mental

health records reveals why a treating physician's opinion is entitled to special weight -- because

he or she has the opportunity to know and observe the patient as an individual over time.

1    McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989).  Such a review also clearly demonstrates

2    that the ALJ's findings -- that Dr. Fitzgerald's and Ms. Moyer's opinions are *not* consistent with

3    the record as a whole -- are not supported by substantial evidence.

4        First, the ALJ reviewed plaintiff's mental health records from March 19, 2009, through May

5    11, 2011, from various treating providers.[6]  According to the ALJ, a December 8, 2010, record

6    showed that plaintiff "reported no difficulty taking care of her animals," and, therefore, was

7    evidence that plaintiff's symptoms improved with treatment.  [AR at 19 (citing AR at 269).]

8    However, as the ALJ later briefly mentions [see AR at 20], in the rest of that progress note

9    plaintiff's treating physician, Tony Lin, M.D., diagnosed plaintiff with PTSD and as underweight,

10   and stated that plaintiff still had flashbacks and difficulty concentrating, was trying to keep her

11   weight up, was "emotionally labile," and cried twice during the examination period.  [AR at 269-70.]

12   The ALJ does not mention that Dr. Lin stated plaintiff got no relief from Celexa, that he was

13   "considering using antipsychotics if [sic] [plaintiff's] symptoms are quite severe," and that he gave

14   plaintiff some Ativan because "her symptoms are similar to hallucinations."  [Id.]

15        Next, the ALJ noted Dr. Lin's May 5, 2011, progress note, which indicated that plaintiff

16   "alleged anxiety and symptoms of PTSD," stated Zoloft was "somewhat helpful," and was "feeling

17   depressed and little pleasure."  [AR at 20-21 (citing AR at 263-64).]  The ALJ also noted that a few

18   days later, on May 11, 2011, plaintiff reported to her primary treatment provider, Helen A. Hillix,

19   licensed MFT, that she was having difficulty eating, sleeping, socializing, performing chores,

20   making decisions, feeling emotions, and believing in a future for herself; and that a mental status

21   examination revealed plaintiff's depressed mood, and noted that her affect was flat and her speech

22   slow, her immediate memory was noted to be partially impaired, and she had moderately impaired

23   judgment and limited insight.  [AR at 21 (citing AR at 284-85).]  The ALJ noted Ms. Hillix's

24   diagnoses of PTSD and M.D.D., and her assessed Global Assessment of Functioning Score of

25

26

27       [6]    Although she reviewed the contents of these records, the ALJ did not indicate the weight

28   she gave to them.  [See generally AR at 20-24.]

41-50.[7]  [Id. (citing AR at 286).]

       The ALJ then reviewed treatment notes dated between August 3, 2011, and October 14, 2011, from plaintiff's treating psychotherapists at the Center for Human Potential.[8]  [Id.]  The ALJ noted that on August 3, 2011, plaintiff was diagnosed with probable PTSD, major depression, generalized anxiety disorder, agoraphobic behavior, and racing and obsessive thoughts.  [Id. (citing AR at 319).]  Other treatment notes from this provider, only some of which are mentioned by the ALJ [see id.] indicate the following:  on August 24, 2011, plaintiff presented as "distraught, anxious," and obsessing on the medical "negligence she believes took her husband from her,"[9] her sleep is restless and interrupted frequently during the night [AR at 318]; on September 7, 2011, she reported that she "can't stop going over and over the thoughts/visions of [her husband] tying the knots in the rope" [id.]; on September 21, 2011, the provider noted that plaintiff is "full of anxiety because she's catastrophising everything -- she's hypervigilant and hardly sleeps [because] of it" [id.]; on January 11, 2012, it was noted that Dr. Fitzgerald had increased the dosage of plaintiff's prescription for Ativan, but that plaintiff did "not seem to have improved since our last session @ the end of November," and had reported to the therapist that "she is actually

_____

       [7]   A GAF score is the clinician's judgment of the individual's overall level of functioning.  It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations.  Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000) ("DSM-IV").  A GAF score in the range of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning, e.g., unable to keep a job. DSM-IV 34. The most recent edition of the DSM "dropped" the GAF scale, citing its "conceptual lack of clarity" and "questionable psychometrics in routine practice."  Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2012).

       [8]   Although she reviewed the contents of these records, the ALJ did not indicate the weight she gave to them.  [See generally AR at 20-24.]

       [9]   In April 2010, plaintiff's husband committed suicide by hanging himself at their home.  [AR at 250.]  Plaintiff came home one day and found a suicide note telling her not to go any further into the house, and she did not go in.  [Id.]  She testified at the hearing that she found out after his death that her husband had tried to get help because he was having thoughts of suicide, but his medical providers had not informed her so that she might have been able to help him.  [AR at 57.]  Two years prior to her husband's suicide, her husband's identical twin brother had also committed suicide by hanging.  [AR at 250, 284.]  Plaintiff witnessed her brother-in-law's body at the time of his hanging.  [AR at 338.]

worse." [AR at 316.] The ALJ noted that during that same time period Dr. Fitzgerald reported that September 7, 2011, and October 11, 2011, mental status examinations showed plaintiff was anxious and depressed, on October 11, 2011, she reported she was unable to stop having thoughts of dead things, and on October 14, 2011, she reported she was not sleeping. [AR at 21 (citing (AR at 358, 359).]

Between January 9, 2012, and February 22, 2012, the ALJ noted that the records of Dr. Fitzgerald and Ms. Moyer showed that plaintiff had financial problems; persistent flashbacks; tightness in her throat and stomach; decreased concentration; severe stress; constant fears of death; anxiety and fear that she would never go back to her former level of functioning; hallucinations; feeling of numbness; decreased weight and appetite, and anhedonia. [See AR at 21 (citing AR at 328, 340, 341, 343, 352, 353, 354-55).] On January 19, 2012, Ms. Moyer indicated that "other assessment tools reflect poss[ible] dissociation and serious [symptoms] of PTSD w/poss[ible] psychosis." [Id. (citing AR at 340.)]

The ALJ next reviewed Dr. Fitzgerald's and Ms. Moyer's treatment records from March 14, 2012, through September 8, 2012. [See AR at 21-23 (citations omitted).][10] As noted by the ALJ, these records reflected such things as the following: mildly depressed mood; decreased appetite, insomnia, decreased short term memory, and high anxiety; plaintiff appeared fearful and panicky; plaintiff was "still obsessing about death and abandonment and has lost so much weight that her clothes are swimming on her"; plaintiff's grooming and hygiene were deteriorating; a mental status examination revealed anxiety, pressured speech, angry affect, clenched jaw and muscle tension in her arms; plaintiff scored 24.6 on a Dissociative Experiences Scale test, and a Burns Depression Scale test showed *severe* depression; plaintiff reported constant intrusive thoughts and images, abnormal fears, interrupted sleep, and appeared somewhat unkempt and highly stressed; she reported decreased appetite and increased depression due to financial worries and grief over the passing of her father; plaintiff evidenced catastrophic thinking and fears; she started

---

[10]   These records were discussed chronologically by the ALJ and, therefore, some of the reports and observations listed herein appear to be repetitive as they were mentioned at different times in the records of Dr. Fitzgerald and Ms. Moyer.

taking Wellbutrin, which helped decrease horrific thoughts; plaintiff alleged fearful thoughts and tearfulness; she was highly anxious, and alleged flashbacks; her thought processes revealed anger and resentment; she exhibited marked distress with rapid speech; plaintiff was able to calm herself "somewhat" with grounding techniques and meditation; she showed signs of improvement when tending to her ranch and animals; she experienced increased anxiety when she left her home; plaintiff had difficulty concentrating and made frequent mistakes performing tasks; she had recently ridden one of her horses but was fearful doing so; she experienced flashbacks, anxiety, and had no appetite; a mental status examination showed an unhappy affect and depressed mood; plaintiff seemed to have "regressed"; she was very fearful and felt she was going to die due to anxiety; plaintiff scored in the "extreme" range on a Burns Anxiety Inventory test, and 82/85 on a PTSD checklist; she experienced nausea likely due to "*high* levels of anxiety"; and she was "able to somewhat calm herself with a calming technique and meditation, although [she] alleged feelings of nausea."  [AR at 21-23 (emphasis added; citations omitted).]

An ALJ must consider all of the relevant evidence in the record and may not point to only those portions of the records that bolster her findings.  See, e.g., Holohan, 246 F.3d at 1207-08 (holding that an ALJ cannot selectively rely on some entries in plaintiff's records while ignoring others).  As the Ninth Circuit recently explained, "[c]ycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."  Garrison, 759 F.3d 995, 1017 (citing Holohan, 246 F.3d at 1205; see also Scott v. Astrue, 647 F.3d 734, 739-40 (7th Cir. 2011) (citations omitted) ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce, and that difference is borne out in Dr. Tate's treatment notes.  Those notes show that although Scott had improved with treatment, she nevertheless continued to frequently experience bouts of crying and feelings of paranoia.  The ALJ was not permitted to 'cherry-pick' from those mixed results to support a denial of benefits.").  Thus, "[r]eports of 'improvement' in the context of mental health issues must be interpreted with an

understanding of the patient's overall well-being and the nature of her symptoms." Garrison, 759 F.3d at 1017 (citing Ryan, 528 F.3d at 1200-01)); see also Holohan, 246 F.3d at 1205 ("[The treating physician's] statements must be read in context of the overall diagnostic picture he draws. That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace.").

In this case, the ALJ never stated the weight she gave to the opinions of plaintiff's treating providers other than Dr. Fitzgerald and Ms. Moyer [see supra notes 6, 8] -- opinions that supported the opinions of Dr. Fitzgerald and Ms. Moyer.  In fact, the only record with which the opinions of Dr. Fitzgerald and Ms. Moyer appear to be inconsistent, is Dr. Rodriguez' January 28, 2011, evaluation.  Accordingly, the ALJ's finding that the opinions of Dr. Fitzgerald and Ms. Moyer opinions are *not* consistent with the record as a whole, is not supported by substantial evidence and, therefore, was not a legally sufficient reason to discount their opinions.

### 2.      "Successful" Use of Calming Techniques

Another reason given by the ALJ to discredit Dr. Fitzgerald's opinion is plaintiff's allegedly "successful" use of meditation and calming techniques.  [AR at 24 (citing AR at 367).]  However, this reasoning does not accurately reflect the record either in part or in whole.  The note referred to by the ALJ as evidence of successful calming techniques -- Ms. Moyer's September 5, 2012, progress note -- also indicated that plaintiff had regressed, was very tearful and felt she will die of anxiety.  [AR at 367.]  At that session, Ms. Moyer attempted to help plaintiff "find [a] healthy place within."  [Id.]  Ms. Moyer reported that plaintiff appeared more "calm @ [the] end but incomplete," and stated that plaintiff was "[a]ble to calm *somewhat*."  [Id. (emphasis added); see also AR at 366 (after plaintiff scored "extreme" on the Burns Anxiety Inventory and an 82/85 on the PTSD checklist, plaintiff was "able to calm somewhat" during the treatment session with coping techniques and meditation).]  Examining these records in the context of the records as a whole -- most of which report that plaintiff presented at each visit with high levels of anxiety and

other emotional lability -- the fact that plaintiff was able to calm herself "somewhat" during one or two treatment sessions with Ms. Moyer does not constitute substantial evidence that plaintiff was able to *successfully* use these techniques even during her treatment sessions let alone on a daily basis outside of those sessions.

Accordingly, this was not a specific and legitimate reason to discount the opinions of Dr. Fitzgerald.

### 3.    Opinions of Dr. Rodriguez

The opinion of an examining physician who examined plaintiff only once, "[is] insufficient to outweigh the opinion of a treating physician who cared for [the plaintiff] over a period of time and who provided an opinion supported by explanation and treatment records." Holohan v. Massanari, 246 F.3d 1195, 1207 (9th Cir. 2001).  This insufficiency is compounded here, where the consulting examiner's opinion was formulated without reviewing any of plaintiff's previous mental health records, and without the benefit of reviewing the post-January 2011 records of plaintiff's treating mental health providers, including Dr. Fitzgerald and Ms. Moyer, among others.  As such, Dr. Rodriguez' examination is little more than a "snapshot" assessment of plaintiff's condition at the point in time in January 2011 that she presented to him for evaluation.  See Rodriguez v. Colvin, 2014 WL 5305722, at *2 (C.D. Cal. Oct. 15, 2014) (holding that where plaintiff's condition was such that her symptoms would wax and wane, "the results of a single examination by a consultant cannot stand as substantial evidence, for they reveal only what took place on that date," and noting that "if ever there was value to the notion of relying on a longitudinal relationship -- the kind a treating physician enjoys with his patient, and one reason that opinions of treating physicians are given greater weight than opinions of consultants . . . it is with a disease that manifests itself differently over time") (citing Garrison, 759 F.3d at 1017).

Thus, the ALJ's reliance on Dr. Rodriguez'[11] "improved mental status examination" -- on the

---

[11]    Although the ALJ does not specifically cite to Dr. Rodriguez' mental status examination, stating only that Ms. Moyer's opinion "is inconsistent with the objective medical evidence as a

16

one date Dr. Rodriguez evaluated plaintiff -- as evidence that Ms. Moyer's opinions were inconsistent with the record as a whole [AR at 24], or that Dr. Fitzgerald's opinion is inconsistent with the record evidence, and the ALJ's determination that Dr. Rodriguez' opinion is entitled to "great weight," are unpersuasive.

### 4.      LCSW as an "Other" Medical Source

The ALJ also discounted Ms. Moyer's opinion in part because an LCSW is not an "acceptable medical source" and her opinion, therefore, "is not entitled to be given the same weight as a qualifying medical source opinion." [AR at 24 (citation omitted).]  Indeed, the fact "that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because . . . 'acceptable medical sources' 'are the most qualified health care professionals.'"  Soc. Sec. Ruling ("SSR")[12] 06-03p.  In contrast, a social worker is not generally considered to be an acceptable medical source (see 20 C.F.R. § 404.1513(d) (including social worker as an "other" medical source)), and "only 'acceptable medical sources' can [provide] medical opinions [and] only 'acceptable medical sources' can be considered treating sources, whose medical opinions may be entitled to controlling weight."  See SSR 06-03p (citations omitted).  Nevertheless, evidence from "other medical" sources, that is, lay evidence, can demonstrate the "severity of the individual's impairment(s) and how it affects the individual's ability to function."  Id.  The Social Security Administration has recognized that with "the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' . . . have increasingly assumed a greater

---

whole *already discussed above in this decision* that shows improved mental status examination," Dr. Rodriguez' mental status examination was the only one in the record  that as a whole showed plaintiff had "improved."  [See, e.g., AR at 20 (emphasis added).]

[12]    SSRs do not have the force of law.  Nevertheless, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." Id. Therefore, according to the Administration, opinions from other medical sources, "who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects." Id.

Relevant factors when determining the weight to be given to an "other" medical source include:  how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairments, and any other factors that tend to support or refute the opinion.  Id.  Thus, "depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' *may outweigh* the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." Id. (emphasis added). The Court finds that such is the case here, and the ALJ erred in concluding that the "snapshot" opinion of consultative examiner Dr. Rodriguez is entitled to more weight than Ms. Moyer's opinion.  Ms. Moyer's treatment notes reflect that she provided mental health treatment to plaintiff weekly throughout much of 2012, and Dr. Fitzgerald saw plaintiff monthly, while Dr. Rodriguez saw plaintiff once, on January 28, 2011, and did not review any of plaintiff's previous mental health records, or have the benefit of reviewing the post-January 2011 records of plaintiff's treating mental health providers, including Dr. Fitzgerald and Ms. Moyer.  [AR at 250, 336-45, 362-410.] Additionally, despite the ALJ's statement that Ms. Moyer's opinion was "brief, conclusory, and inadequately supported by clinical findings" [AR at 23], a review of the record shows that not only is her opinion supported by her own weekly treatment notes [see, e.g., AR at 340-45, 366-88], but that Ms. Moyer administered the Burns Anxiety Inventory and PTSD Checklist on several occasions [see, e.g., AR at 362-65, 400-02], as well as other mental health questionnaires [see, e.g., AR at 403-10], and relied on these clinical screening tools in arriving at her April 16, 2012,

opinion of plaintiff's functional limitations. [AR at 338.] Accordingly, substantial evidence does not support the ALJ's finding that Ms. Moyer's opinion was "brief, conclusory, and inadequately supported by clinical findings." [AR at 23.]

### 5.    Activities of Daily Living

The ALJ also specifically discounted the opinions of Dr. Fitzgerald as inconsistent with plaintiff's activities of daily living, "including caring for multiple animals,[13] some household chores and preparing simple meals."[14] [AR at 24.] The ALJ generally described plaintiff's everyday activities as including "some household chores, preparing simple meals, occasional grocery shopping, occasional visits from family and occasional use of the internet." [AR at 18 (citations omitted).] She characterizes these activities as evidence of a "somewhat normal level of daily activity and interaction" despite plaintiff's impairment. [Id.]

While an inconsistency between a treating physician's opinion and a claimant's daily activities may be a specific and legitimate reason to discount a treating physician's opinion, this is not true when a "holistic review of the record does not reveal an inconsistency between the treating providers' opinions and [the claimant's] daily activities." Ghanim, 763 F.3d at 1162. Here, a review of the record fails to show how these limited daily activities are either a "somewhat normal level" of daily activity, or how they are inconsistent with Dr. Fitzgerald's -- or Ms. Moyer's -- opinions of plaintiff's functional limitations.

For instance, plaintiff testified that although she "sometimes" does chores such as vacuuming, washing dishes, or loading the dishwasher, and while there is no physical reason she could not do them, she mentally lacks the energy or motivation to want to do those chores.   [AR

---

[13]    Plaintiff testified she had four dogs, twelve cats, three horses, four goats, four chickens, and six pigs. [AR at 18, 39.]

[14]    Similarly, the ALJ specifically discounted Ms. Moyer's opinions as inconsistent with plaintiff's activities of daily living, "including caring for multiple animals, performing personal grooming activities without assistance, some household chores and occasionally using the internet." [AR at 24.]

at 38-39, 213.] She did not testify that she does these activities every day. [See id.] With respect to her animals, she testified that she picks up after the dogs and horses in the yard [AR at 42, 211], and feeds the animals every day. [AR at 211.] Her roommate also assists with the animals, and she pays someone else to come every day for about three hours to help care for the animals. [AR at 55.] Plaintiff also testified that because she "can't relate to people," and does not trust or like anyone because she has "been betrayed by [her] entire world," her animals are what she "surround[s her] world around," and they provide her a "ritualistic lifestyle" and routine that she can do. [AR at 52.] Additionally, although plaintiff testified that she is able to perform personal grooming activities without assistance, there are several mentions in the record noting plaintiff's unkempt appearance and ill-fitting clothing, implying that perhaps plaintiff is not always as capable of performing these activities as she believes herself to be. [See, e.g., AR at 314, 344 (two treatment notes discuss disheveled appearance), 374, 383, 384 (two treatment notes), 388.] Relating to meal preparation, plaintiff testified that she does not "really cook," she just heats things up because she "is paranoid [she is] going to burn the house down." [AR at 51.] Finally, relating to plaintiff's use of the internet, plaintiff testified, and the ALJ found, that such use was only "occasional." [AR at 18, 56.]

The ALJ provided no explanation as to how plaintiff's limited activities as described above are inconsistent with Dr. Fitzgerald's opinions regarding plaintiff's inability to perform tasks involving understanding and memory, or sustained concentration and persistence; to socially interact and adapt; or to complete a normal workday without interruption from psychologically-based symptoms. [AR at 346-48.] Moreover, in light of plaintiff's mental health treatment records as a whole, the Court is unable to conclude that these limited activities constitute substantial evidence sufficient to detract from Dr. Fitzgerald's findings in any significant way.

**D.    CONCLUSION**

Based on the foregoing, the ALJ's determination that Dr. Fitzgerald's opinions were entitled to little weight is not supported by substantial evidence.  Because the ALJ did not provide any

specific and legitimate reasons supported by substantial evidence for giving Dr. Fitzgerald's opinions" little weight," remand is warranted.

## VI.

## REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits. <u>McAllister</u>, 888 F.2d at 603.  Where (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand, it is appropriate to exercise this discretion to direct an immediate award of benefits. <u>Garrison</u>, 759 F.3d at 1020 (setting forth the three-part credit-as-true standard for exercising the Court's discretion to remand with instructions to calculate and award benefits); <u>see also</u> <u>Lingenfelter v. Astrue</u>, 504 F.3d, 1028, 1041 (9th Cir. 2007); <u>Benecke v. Barnhart</u>, 379 F.3d 587, 595-96 (9th Cir. 2004).  Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate.  <u>See</u> <u>Benecke</u>, 379 F.3d at 593-96; <u>see also</u> <u>Connett v. Barnhart</u>, 340 F.3d 871 (9th Cir. 2003) (cautioning that the credit-as-true rule may not be dispositive of the remand question in all cases, even where all three conditions are met).  In <u>Garrison</u>, the Ninth Circuit, noting that it had never exercised the flexibility set forth in <u>Connett</u> in a published decision, clarified that the nature of the flexibility described in <u>Connett</u> is "properly understood as requiring courts to remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." <u>Garrison</u>, 759 F.3d at 1020-21.

In this case, as discussed above, the ALJ failed to provide legally sufficient reasons for discounting the opinions of plaintiff's treating providers.  However, the Court notes that while

plaintiff has made a cursory assertion that she is entitled to an award of benefits [see, e.g., JS at 19-20], she has completely failed to proffer any argument for that remedy in light of the foregoing case authorities and has made no attempt to show that this case warrants remand for an award of benefits.  Specifically, the most essential factual issue -- whether if the improperly discredited evidence were credited as true, the ALJ would be required to find plaintiff disabled -- remains unresolved because the record contains no VE testimony reflecting that a person could not work with the limitations described by Dr. Fitzgerald.  [But see AR at 65-67 (VE testified that all work would be eliminated if an individual was unable to interact with the public at all, and unable to concentrate on very simple, menial tasks for 80 percent of the work day).[15]]

Therefore, the Court finds that remand for further proceedings is warranted here because the third Garrison condition has not been met and, therefore, there are outstanding issues that must be resolved before a final determination can be made.  See Harman v. Apfel, 211 F.3d 1172, 1180 (9th Cir. 2000) (remanding for further proceedings in part because there was no testimony from the vocational expert that the limitations established by the improperly discredited evidence would render claimant unable to engage in any work).

However, in an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Magistrate Judge will set forth the scope of the recommended remand proceedings.  First, because the ALJ improperly rejected the opinion of plaintiff's treating psychiatrist, Dr. Fitzgerald, and LCSW Moyer, the ALJ on remand shall credit their opinions as a matter of law.  See Widmark, 454 F.3d at 1069 ("Because the ALJ failed to provide adequate reasons for rejecting [the examining physician]'s opinion, we credit it as a matter of law."); Edlund v. Massanari, 253 F.3d 1152, 1160 (9th Cir. 2001) (crediting, as a matter of law, improperly rejected treating physician opinions).  Next, in light of the opinions of Dr. Fitzgerald and Ms. Moyer, the ALJ shall reconsider all of plaintiff's limitations in making the RFC determination.  Thereafter, with the assistance of a VE as required, the ALJ shall proceed through steps four and

---

[15]   Counsel's hypothetical was interrupted several times by the ALJ and the VE and, therefore, ultimately was somewhat unclear as to the limitations being suggested.

five to determine whether plaintiff can perform her past relevant work or any other work existing in significant numbers in the national economy.

## VII.

### CONCLUSION

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  March 30, 2015

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE